**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PETER CHIYKOWSKI, d/b/a ROCK, PAPER, CYNIC <br><br> Plaintiff, <br><br><br> v. <br><br><br> Marc Goldner, individually and as officer of GOLDEN BELL ENTERTAINMENT LLC and GOLDEN BELL STUDIOS, LLC and GOLDEN BELL ENTERTAINMENT, LLC and GOLDEN BELL STUDIOS, LLC <br><br> Defendants. | **No.** <br><br> **ECF Case** <br><br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Peter Chiykowski, by and through his undersigned attorneys, Chinta Perdomo Berks & Fratangelo LLP, for his complaint against Defendants Marc Goldner, individually and as president of Golden Bell Entertainment, LLC and Golden Bell Studios, LLC; Golden Bell Entertainment, LLC. and Golden Bell Studios, LLC. (collectively "Defendants"), alleges as follows based on his personal knowledge and upon information and belief:

**THE PARTIES**

1.      Plaintiff, PETER CHIYKOWSKI ("Mr. Chiykowski", "Artist") is, and at all times hereinafter mentioned was, a resident of Canada until November 5, 2018 and thereafter a resident of the United Kingdom.

2.      Defendant, GOLDEN BELL ENTERTAINMENT, LLC ("Golden Bell"), upon information and belief is a limited liability company organized under the laws of the State of California, with a principal place of business located at 15 Peacock Drive, Roslyn, New York

11576 and with a registered agent for service of process located at c/o California Corporate Agents, Inc., Attn: Alex Patel, 16830 Ventura Blvd, Encino, California 91436.

3.       Defendant GOLDEN BELL STUDIOS, LLC ("Golden Bell Studios"), upon information and belief is a limited liability company organized under the laws of the State of Nevada, with a principal place of business located at 37 Northern Blvd, Suite 324, Greenvale, New York 11548 and with a registered agent for service of process located at c/o CSC Services of Nevada, Inc., 2215-B Renaissance Drive, Las Vegas, Nevada 89119.

4.       Defendant, MARC GOLDNER ("Goldner"), upon information and belief is, and at all times hereinafter mentioned was, a resident of the County of Nassau, State of New York. Upon information and belief, Golden Bell and Golden Bell Studios are *alter egos* of Goldner and of one another. In addition, upon information and belief, Goldner owns and controls these companies which he personally operates from his home in Long Island and uses these companies interchangeably in dealings with third parties.

## NATURE OF THE ACTION

5.       This is an action is for a declaratory judgment and for monetary damages sustained by Plaintiff as a direct result of Defendants' breach of contract, breach of fiduciary duties as well as Defendants' tortious and egregious conduct, including fraudulent misrepresentations, tortious interference with contractual relations, and other related claims.

## JURISDICTION AND VENUE

6.       This Court has diversity jurisdiction over this action under 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000 (seventy-five thousand dollars).

7.      For declaratory counts, this Court has jurisdiction under 28 U.S.C. §§2201-02.

8.      This court has personal jurisdiction over Defendants Marc Goldner, Golden Bell and Golden Bell Studios because these Defendants maintain a principal place of business within this judicial district.

9.      Upon information and belief, venue is proper in this district under 28 U.S.C. §1391 because the Defendants reside in this district under the statutory definitions.

## FACTUAL BACKGROUND

10.     Plaintiff, Peter Chiykowski, is a visual artist, comics illustrator, and an author of songs, short stories, webcomics, comic books and strips. Since 2008, Plaintiff has popularized his works under the pseudonym, "Rock Paper Cynic." **See Exhibit 1 to Plaintiff's Declaration.**

11.     Plaintiff is the author of the books "Is It Canon?" as well as the anthology "Be a Turtle and Other Secrets to a Happy Life by Rock, Paper, Cynic" ("Be a Turtle" or the "Book") which is based on Plaintiff's webcomic "Rock Paper Cynic" and the anthology "The HMS Bad Idea." **See Plaintiff's Declaration at ¶ 2.**

12.     Plaintiff is the illustrator and creator of the characters embodied in the game "Turtles Riding Airships" which Plaintiff developed with non-party Jason Wiseman ("Mr. Wiseman"). **Id at ¶¶s 6-7.**

### Collaboration with Jason Wiseman: "Turtles Riding Airships"

13.     In April 2013, Plaintiff met Jason Wiseman ("Mr. Wiseman"), who is a well-known creator of tabletop board and card games. Plaintiff and Mr. Wiseman have been collaborators since that time. **See Plaintiff's Declaration at ¶ 5.**

14.     In 2015, Plaintiff and Mr. Wiseman decided to collaborate on a new tabletop game. Mr. Wiseman would create the mechanics of the game and Plaintiff would create the

illustrations and the graphic design. That game later became "Turtle Riding Airships." **See Plaintiff's Declaration at ¶ 6.**

15.      In February 2017, Plaintiff and Mr. Wiseman had discussions about the possibility of having a third-party publisher distribute the game. Mr. Wiseman informed Plaintiff that he had been in discussions with Defendants through Marc Goldner, owner and CEO of Defendant Golden Bell and Golden Bell Studios. **See Plaintiff's Declaration at ¶ 7.**

16.      Plaintiff and Mr. Wiseman agreed that Defendants would publish and distribute "Turtles Riding Airships" because they believed that the game would benefit from Defendants' larger distribution network and business infrastructure, which would lead to substantially more sales than through self-publishing. **See Plaintiff's Declaration at ¶ 8.**

17.      As a result, Mr. Wiseman signed an agreement with Defendants to create and deliver to Defendants the game "Turtles Riding Airships." Plaintiff was not a party to this agreement. Instead, Plaintiff signed a separate Collaboration Agreement with Defendants involving Plaintiff's portion of his intellectual contributions to the collective work embodied in "Turtles Riding Airships."  **Id.**

18.      Plaintiff's collaboration with Mr. Wiseman on "Turtles Riding Airships" continued through April 2017, during which time Plaintiff was illustrating the game.

19.      In May 2017, Plaintiff began sending sample game cards and other assets, usually first to Mr. Wiseman and then to Defendants. On June 1, 2017, Plaintiff delivered the first batch of finished "Turtles Riding Airships" illustrations and design assets to Defendants which were received with praise and enthusiasm from Goldner and his colleagues, Rachel Korsen and Robert Gross**.** Upon information and belief, Rachel Korsen is Marc Goldner's girlfriend and co-founder of Golden Bell along with Robert Gross. On June 15, 2017, Plaintiff

4

furnished the final batch of files for "Turtles Riding Airships" to Defendants. **See Exhibits 7 to Plaintiff's Declaration and Plaintiff's Declaration at ¶¶s 19, 22, 25.**

20.     In February 2017, Plaintiff launched a Kickstarter campaign to raise funds to print his books "Be a Turtle" and "Is It Canon?" As a result of the Kickstarter campaign, 334 Kickstarter backers made pledges supporting the development of the books and bring them to print. Plaintiff successfully raised approximately $20,000.00 during the one-month Kickstarter campaign. **See Exhibit 2 to Plaintiff's Declaration.**

21.     In exchange for the backers' pledges, Plaintiff agreed to send rewards to each of them on or before the end of August, 2017. The rewards included a printed copy of each book and a digital PDF version as well as related memorabilia, such as wooden coins. **Id.**

22.     In March 2017, during PAX East, a gaming convention in Boston, Plaintiff was introduced to Defendant Marc Goldner. During discussions with Plaintiff about the "Turtles Riding Airships" game, Goldner was optimistic about potential strong game sales when Defendants finally released the game to the public. **See Plaintiff's Declaration at ¶ 11.**

23.     On or about March 11, 2017, Plaintiff and Defendant Goldner had additional discussions about Plaintiff's Kickstarter campaign for the book "Be a Turtle" and the printing offers Plaintiff had received for said book. Goldner represented to Plaintiff that he had brokered successful licensing and distribution deals for his companies, and also that he did not allow vendors to return unsold products. Goldner also informed Plaintiff that he had recently added approximately 200 more games to Defendants' catalogue. **See Plaintiff's Declaration at ¶ 12.**

24.     After the convention, Plaintiff began to exchange texts and occasional calls with Defendant Goldner, discussing merchandizing ideas for "Turtles Riding Airships." **See Plaintiff's Declaration at ¶ 14.**

25.     During one of many conversations, Plaintiff informed Goldner that he needed to find cost effective printing options for the books Plaintiff was producing through his Kickstarter campaign. Plaintiff sent an email to Goldner on March 24, 2017 explaining the situation and Goldner replied confirming that he could in fact find better pricing while disclosing that PrintNinja "uses one of our factories." Goldner made it clear to Plaintiff that he wanted to discuss several items including a "Contract" with Plaintiff. **See Exhibit 3 to Plaintiff's Declaration.**

26.     On March 29, 2017, in an effort to obtain a cost-effective quote for his books, Plaintiff informed Defendants that even though he had promised his Kickstarter backers to fulfill the orders by August 2017, he would be able to extend the deadline slightly if he could deliver quality at a cost-effective price point. In the same correspondence, Plaintiff provided Defendants with production specifications to obtain a quote. **See Plaintiff's Declaration at ¶ 17; see also Exhibit 3, pp. 2-3 to the Declaration.**

27.     On May 27, 2017 Defendant Goldner informed Plaintiff that he had secured pricing to print the books at $2 per unit. Plaintiff was thankful for the extremely favorable quote and as a result, he started to reforecast his overall budget. See **Exhibit 4 to Plaintiff's Declaration.**

28.     On June 11, 2017, Plaintiff delivered to Defendants the final draft of "Be a Turtle" while informing that the content was ready to go press. Defendants praised the Book as "perfect" and informed that other than a typo, which Plaintiff promptly corrected, there were no other content changes they would make. **See Exhibit 6 to Plaintiff's Declaration.**

29.     During the multiple communications between Plaintiff and defendant Goldner regarding a potential Collaboration Agreement, Plaintiff reiterated that once printed, Defendants

had to ship the books to Plaintiff directly so that he can then forward the books to his Kickstarter backers by August or September 2017 at the latest. Goldner confirmed that Defendants wanted to publish the "Be a Turtle" book and work with Plaintiff to meet his deadlines. **Plaintiff's Declaration at ¶¶ 24, 26.**

**The Collaboration Agreement**

30.     On or about June 23, 2017, Defendants sent Plaintiff a proposed Collaboration Agreement to sign. Following Plaintiff's receipt of the Collaboration Agreement, Defendant Goldner insisted that Plaintiff promptly sign the Agreement so that Defendants could make the collaboration public and announce the "Be a Turtle" book as a "flagship property." **See Exhibit 8 to Plaintiff's Declaration.**

31.     After reviewing the proposed Collaboration Agreement, Plaintiff noticed that it included his previously published book, "The HMS Bad Idea" even though Plaintiff had never discussed including this book in the Agreement. **Plaintiff's Declaration at ¶ 28**.

32.     In an email to Defendants on June 23, 2017, Plaintiff requested several clarifications and proposed some changes. Plaintiff also made it absolutely clear that he would retain his rights to the characters of his webcomic and also requested Defendant Goldner to confirm that Plaintiff will be able to freely produce work outside the Collaboration Agreement involving the characters. **Id at ¶¶s 28-30** and **Exhibit 8 p. 1.to Plaintiff's Declaration.**

33.     In response, Defendant Goldner reassured Plaintiff that he was free to collaborate with others and that Defendants wanted for Plaintiff to "grow your brand as much as humanely possible so we'd never not allow you or even think to ask you not to participate in a great opportunity." **See Exhibit 8 to Plaintiff's Declaration.**

34.     With Defendant Goldner's assurances that Plaintiff's characters and future livelihood were in fact protected, Plaintiff signed the Collaboration Agreement on June 23, 2017. **See Exhibit 9 to Plaintiff's Declaration.**

35.     Pursuant to the terms of the Collaboration Agreement, Plaintiff and Defendants agreed to collaborate on the "Turtles Riding Airships" game, and the book "Be a Turtle and other Secrets to a Happy Life by Rock, Paper, Cynic", (collectively the "Works").   A month later on July 23, 2017 the parties also signed an addendum to the Collaboration Agreement (the "Peter Turtles Addendum") including the "HMS Bad Idea" as part of the Works. **See Exhibit 14 to Plaintiff's Declaration.**

36.     According to the Collaboration Agreement, Plaintiff would receive as consideration, three advances totaling $12,500 and 10% of the net sales of the Works as well as 1,000 complimentary copies of the book "Be a Turtle."   In exchange for the consideration, Plaintiff assigned his ownership rights into the Works to Defendant Golden Bell as well as the right to exclusively handle "all worldwide distribution, production, marketing, reprinting, sales, logistics, warehousing, social media, and publication of the WORKS." **See Exhibit 9, ¶¶ 2.D., 6.B.**

37.      Under the terms and conditions of the Collaboration Agreement, Plaintiff also appointed Defendant Golden Bell as his exclusive agent "for the sale and other disposition of the "Works" and Plaintiff agreed to refrain from monetizing or reproducing the Works because, under the Collaboration Agreement, this task had been exclusively assigned to Defendant Golden Bell.  **Exhibit 9 ¶¶s 2.E, 2.M**. Additionally, pursuant to the Collaboration Agreement, Defendant Golden Bell had the duty to "handle and manage the Works in the best interest of the parties." **Id at 2.Q.**

38.     However, Defendants failed to pay Plaintiff the full amount of the agreed upon advances and deliver the 1,000 complementary copies of the book "Be a Turtle" and to this date, Defendants have failed to publish, distribute or otherwise commercialize the Works. **See Plaintiff's Declaration at ¶ 40.**

39.     On June 29, 2017, Plaintiff approached Defendant Goldner to reiterate his printing and shipping goal for the early fall and requested him to provide the Golden Bell logo, copyright page text, ISBN #s and files, book spine width, and hardcover wrap specifications. **See Exhibit 12 to Plaintiff's Declaration.**

40.     On June 30, 2017, Defendant Goldner also executed the Collaboration Agreement and a week later, on July 4, 2017, Rachel Korsen confirmed that it will take about "2-3 weeks to get a sample started and then between 20-25 days for production, and then about 30 days to ship plus or minus a week or so for customs." Defendant Goldner was also copied on this email exchange. **See Exhibit 12 to Plaintiff's Declaration.**

**Defendants Unreasonable and Willful Delays**

41.     From July 11, 2017 to approximately July 20, 2017, Plaintiff diligently followed up with Defendants regarding exact printing timelines, notices, logos, advertising materials, copyright notices, softcovers and hardcovers variants, paper thickness and many other logistical and printing details for the "Be a Turtle" book. Plaintiff always endeavored to do his part to avoid any delays in the printing timeline as his main priority was to fulfill the orders of his Kickstarter backers in time. **See Plaintiff's Declaration at ¶¶s 41-47.**

42.     On July 23, 2017, Plaintiff signed the "Peter Turtles Addendum" agreeing that Defendant Golden Bell would also serve as publisher for the "The HMS Bad Idea." Plaintiff agreed to include this book because based on his conversations with Goldner, Plaintiff

understood that the combined print runs of "The HMS Bad Idea" as well as the "Be a Turtle" would bring the unit price for the books further down. **See Exhibit 14. To Plaintiff's Declaration.**

43.    On August 30, 2017 Plaintiff sent an email to Defendant Goldner reiterating what was missing from Defendants to complete the books and stressed the necessity to get the books to print by specifically requesting if there was anything he could do to help move things along by stating "I've promised backers I'd ship everything in November/December, so let me know what we need to do now to make that happen" and Defendants acknowledged receipt. **See Exhibit 15 and Exhibit 16 to Plaintiff's Declaration.**

44.    On September 14, 2017, Plaintiff requested Defendants an update on printing costs per unit for the books, since based on the combined print runs for "Be a Turtle" and "The HMS Bad Idea," Plaintiff anticipated that pricing would be below the $2 per unit quote. Plaintiff also provided an address in Canada and asked for books to be delivered in time for the convention PAX Unplugged starting November 17, 2017. **See Exhibit 8-A.**

45.    On September 15, 2017, Rachel Korsen reached out to Plaintiff to inform that she could not find certain files, such as the cover and endpapers. Although these files were provided to her only two weeks ago, Plaintiff re-sent individual links to each individual asset and a video to explain the arrangements of the endpapers. **Id.**

46.    From September 15, 2017 until September 27, 2017 Plaintiff had multiple exchanges with Defendants regarding printing specifications, graphics, logistics, how to open digital files as well as details of spot UV printing on the book covers. Plaintiff was very surprised that his publisher and printing manager had absolutely no idea on how to find out basic information and kept raising the same exact questions over and over again, particularly after the

files were delivered and the process was explained to Defendants nearly three months earlier. **Plaintiff's Declaration at ¶¶s 52-56.**

47.     On September 27, 2017, Defendants confirmed that the printer had the digital files of the books and was checking them. **See Plaintiff's Declaration at ¶ 57.**

48.     Notwithstanding Defendants' confirmation on September 27, 2018 that the printer had the files for printing, Plaintiff received several requests from Defendant Goldner, on or about October 28, 2017, asking Plaintiff to make additional changes to "Be a Turtle" and "The HMS Bad Idea." Plaintiff was extremely confused because he was under the impression that the books were already in the printing production stage. In an effort to deliver the books to his Kickstarter backers and albeit his frustration, Plaintiff agreed to discuss the changes and made the requested edits. **Plaintiff's Declaration at ¶¶ 61-68.**

### Plaintiff's Concerns about Defendants' Business Practices

49.     At this time, Plaintiff had serious doubts about Defendants' legitimacy as a reputable publisher and distributor. Plaintiff also feared that Defendants did not have Plaintiff's best interest in mind but instead had their own agenda and plans to use Plaintiff's Works for their sole advantage. **Plaintiff's Declaration at ¶ 67**

50.     Concerned about the delays on both "Be a Turtle" and "Turtles Riding Airships", Plaintiff searched online for references to listed publication dates for either book. Plaintiff found that Defendants had failed to promote either of these so-called "flagship properties" and unable to find any information about their release. **Plaintiff's Declaration at ¶ 76.**

51.     In early November 2017, Plaintiff began to research Defendants online. Plaintiff found a reddit thread citing Golden Bell's "predatory contracts" and claiming and

"Golden bell is a scam." Plaintiff soon found more online discussions with warnings such as "If you ever are contacted by them, run the other way." Defendants were mentioned in several places as scammers.  https://www.bgdf.com/forum/bgdf-esp/discusión-general/kickstarter-help; *see also*

https://www.reddit.com/r/tabletopgamedesign/comments/66hz4m/game_publishers_going_big_vs_keeping_it_indie/. **Plaintiff's Declaration at ¶ 80.**

52.     On November 26, 2017, Defendants reached out to advise Plaintiff that they were pulling out of the print run which meant that Defendants were no longer going to provide Plaintiff with the 1,000 complimentary copies of the book "Be a Turtle" for at least 6 months and Plaintiff's books would now cost $4.20 to $4.52 each before the shipping costs. Plaintiff had assigned rights to Defendants in connection to "The HMS Bad Idea" precisely to bring the cost of printing to less than $2.00 per unit. **Plaintiff's Declaration at ¶ 82.**

53.     Plaintiff's book production budget for his initial run would end up costing him approximately three times what Plaintiff had expected based Defendants' promises. It also appeared that the books would not arrive until February 2018. **Plaintiff's Declaration at ¶ 84.**

54.     On November 29, 2017, Plaintiff received Defendants' first threatening message asking if Plaintiff had informed Megan McKay about defendant Golden Bell's trademark application for "Unipegasaurus."  Ms. McKay is the creator of a character called "Unipegasaurus" featured in a game that Mr. Wiseman had developed prior to signing with Defendants. Defendant Goldner explained that Defendants were pursuing legal action against Megan McKay. Defendant Goldner asked that Plaintiff convince Ms. McKay to back down because Defendants' conflict with Ms. McKay was allegedly Plaintiff's fault. **Plaintiff's Declaration at ¶ 87.**

55.     On November 30, 2017, Goldner admitted responsibility for the delays in printing the books and wrote "this I take 100% of the blame for" while also claiming lack of knowledge regarding Plaintiff's deadline for the Kickstarter orders. **See Exhibit 20 to Plaintiff's Declaration.**

56.     In several text messages during November 2017, defendant Goldner again threatened Plaintiff about the issue with Ms. McKay by representing that his attorney was going to "destroy this girl's life," and that he did not feel bad about it all. Defendant Goldner also wrote that Ms. McKay's guest art would have to be removed from Plaintiff's book, along with the foreword by Nick Seluk, a New York Times-bestselling cartoonist whose contributions to the book were a major part of the promise Plaintiff made to Kickstarter backers. **See Plaintiff's Declaration at ¶ 91 and Exhibit 21, to the Declaration.**

57.     After realizing that Defendants had no intention to publish the books in the near future and after having compromised his reputation with Kickstarter backers several times because of Defendants' delays and changes to the "Be a Turtle" book, on December 19, 2017, Plaintiff requested Defendants to return his rights on the Books and that Plaintiff would print the copies at his own expense and deliver the copies to the Kickstarter backers. But Defendants refused. **See Exhibit 22 to Plaintiff's Declaration.**

58.     On January 9, 2018, Plaintiff requested Defendants to allow him to post an update to his Kickstarter backers. A couple of weeks later, Defendant Goldner denied Plaintiff's effort to salvage his reputation with his Kickstarter backers.  **See Plaintiff's Declaration at ¶ 99.**

59.     Notwithstanding Defendants' multiple unreasonable changes in the printing timelines, false promises, and threats, on February 6 2018, in an effort to mitigate damages and attempt to salvage his reputation with his Kickstarter backers, Plaintiff proposed that Defendants

use another printing company that offered Plaintiff a lower price per unit after Canadian dollar conversion and would have allowed Plaintiff to fulfill the Kickstarter orders within a couple of weeks with no import shipping fees. But Defendants refused. **See Exhibit 23 to Plaintiff's Declaration.**

**Plaintiff Agrees to Purchase a 2,000 Unit "Print Run" from Defendants**

60.     On February 13, 2018, Defendant Goldner came back with a slightly more competitive quote of $10,600 for the books, which was still 2.5 times more expensive than the original quote Defendants gave to Plaintiff in June 2017. **Plaintiff's Declaration at ¶ 103**.

61.      After over nine months following Plaintiff's execution of the Collaboration Agreement, Defendants had failed to print the books, publish and distribute the Works, pay all of the agreed upon advances, or deliver the agreed upon 1,000 complementary copies of the "Be a Turtle" book to Plaintiff. **Plaintiff's Declaration at ¶¶ 145, 147**.

62.     At this time, desperate and without any feasible alternative, Plaintiff had no choice but to purchase copies of his own books (one print run) from Defendants. With the Kickstarter orders delayed for over seven months, Plaintiff had no choice but to pay Defendants $10,060 to purchase 2,000 units of his own Book. Plaintiff paid Defendants $7,000 on February 25, 2018 and $3,600 on July 4, 2018. **See Exhibit 24 and Exhibit 25 to Plaintiff's Declaration.**

63.     On May 3, 2018, Plaintiff wrote Defendant Golden Bell to request them delivery of the books by the beginning of August 2018, so that he can honor his promise to the Kickstarter backers a year later. **See Plaintiff's Declaration at ¶ 110.**

64.     On May 29, 2018 Goldner replied to Plaintiff assuring him that Defendants could send the books to print that Sunday, in three days' time. **See Exhibit 26 to Plaintiff's Declaration.** Thereafter, on June 27, 2018, Defendant Goldner indicated that the factory would

14

print books in 20 days and shipping would then take 20-30 days. **See Plaintiff's Declaration at ¶ 122.**

65.     On September 19, 2018, after Plaintiff's multiple follow-ups and requests for updates, defendant Goldner sent a picture to Plaintiff suggesting the print run was ready.  **See Exhibit 27 to Plaintiff's Affidavit.**

66.     Upon information and belief, Defendants have been in possession of the 2,000 copies of the print run since at least September 2018. However, Plaintiff was still waiting for the books to arrive. **See Plaintiff's Declaration at ¶ 126.**

67.     As a result of Defendants' refusal to deliver the copies of the books to the Plaintiff so that Plaintiff can deliver to Kickstarter backers, Plaintiff incurred significant out of pocket losses as well as irreparable injury to his reputation in the industry. **See Plaintiff's Declaration at ¶ 97.**

68.     On September 29, 2018, defendant Goldner approached Plaintiff to discuss future projects but Plaintiff had no intention to discuss future collaborations until Defendants satisfactorily complied with the Collaboration Agreement and delivered the books to the Kickstarter backers. **See Exhibit 28 to Plaintiff's Declaration.**

69.      Plaintiff stated that since the first project with defendant Golden Bell was late by over 14 months, Plaintiff wanted to see how the books turned out before talking about the next project. Plaintiff also requested an update on the books, and defendant Goldner replied that he would "check in with the box factory." Thereafter, defendant Goldner claimed that the books had not been delivered to Plaintiff because of a delay caused by the "box factory." **Plaintiff Declaration at ¶¶s 128-129.**

70.    Defendant Goldner requested Plaintiff to work on certain art for a different game, "Lunarbaboon," while he "worked on delivering the books, and on promoting defendant Golden Bell's "Lunarbaboon" Kickstarter campaign to Plaintiff's backers, who still had not received their books or any revised timeline for their books. Plaintiff refused, explaining that he felt uncomfortable to promote another project to his backers who had had to wait so long without their books or information on their books. **Plaintiff Declaration at ¶ 130.**

71.    On October 1, 2018, defendant Goldner claimed for the first time since the parties executed the Collaboration Agreement that "Turtles Riding Airships" was incomplete and therefore Plaintiff should not have been entitled to the advance. **Plaintiff Declaration at ¶ 131.**

72.    Under the Collaboration Agreement, advances are disbursed as consideration for Plaintiff's grant of rights to Defendants on the Works and are not contingent upon delivery. **See Exhibit 9 to Plaintiff's Declaration.**

73.    On or about October 16, 2018, Plaintiff retained Isaac Fine, Esq., a California based attorney, to start good faith settlement discussions and at the very least attempt to convince Defendants to deliver the books to Plaintiff. Despite Plaintiff's explicit instructions to direct contract conversations to his attorney, defendant Goldner continued harassing Plaintiff with baseless claims. At this time, defendant Goldner wrote that Defendants own the rights to all of Plaintiff's future works. **See Exhibit 30 to Plaintiff's Declaration.**

74.    In October 2018, Plaintiff requested permission from Defendants to write the Kickstarter backers with an update. Defendant Goldner denied Plaintiff permission, misrepresenting that Defendants owned options on all of Plaintiff's future works as well as existing works that Plaintiff jointly created and produced with outside collaborators, such as "Is

16

It Canon" and "What's George Doing Today," which Plaintiff produced with Aaron Lenk. **See Plaintiff's Declaration at ¶ 137.**

75.     Defendants also claimed that they owned the rights to Plaintiff's book compilation of short stories that came out in September 2018, for which Plaintiff had a pre-existing agreement with his old publisher, and which Plaintiff had disclosed to Defendants prior to executing the Collaboration Agreement. **See Plaintiff's Declaration at ¶ 142.**

76.     Defendant Goldner threatened Plaintiff with legal action unless Plaintiff fired his then attorney, Isaac Fine. Furthermore, Defendant Goldner threatened Plaintiff to hold the copies of the books hostage and refused to pay Plaintiff any royalties and deliver Plaintiff's complementary copies of the book until Plaintiff fired his attorney.  **See Plaintiff's Declaration at ¶¶ 143-144.**

77.     On November 16, 2018, following a long negotiation with Defendants' counsel, Defendants granted permission to Plaintiff to post an update to the Kickstarter backers regarding the status of the orders.  **Id at ¶ 150.**

78.     On the same day, November 16, 2018, in yet another attempt to further coerce Plaintiff and misappropriate his future works, Defendants filed an application before the United States Patent and Trademark Office attempting to fraudulently obtain registration for Plaintiff's mark "Rock Paper Cynic." "Rock Paper Cynic" is not only Plaintiff's well recognized pen name and digital pseudonym since at least October 31, 2008, but also his intellectual property which was not part of the Collaborative Agreement.  Defendants fraudulently submitted as specimens of use snapshots of plaintiff's website showing goods displayed on plaintiff's online store. The use of plaintiff's website images not only was done to defraud the USPTO and without plaintiff's permission, but also infringed on plaintiff's copyrights  **See Plaintiff's Declaration at ¶ 152.**

79.     Following Defendants' constant threats and fraudulent trademark application, Plaintiff realized that notwithstanding his payment to Defendants to purchase the copies of the book to fulfill the Kickstarter orders, Defendants had not been negotiating in good faith and in fact, did not have the intention to deliver the Book copies and that holding the copies hostage was Defendant's unlawful strategy to coerce Plaintiff into assigning his future works to Defendants. **See Plaintiff's Declaration at ¶ 153.**

80.     Plaintiff has attempted to settle this matter out of court with Defendants. Defendants have no apparent intention to engage in meaningful settlement negotiations which has caused Plaintiff to incur substantial losses, counsel fees and other monetary damages. **See Plaintiff's Declaration at ¶ 154.**

81.     Plaintiff had no other choice but to commence an action to preserve his rights and recover monetary damages resulting from Defendants unlawful actions. **See Plaintiff's Declaration at ¶ 153.**

**AS AND FOR THE FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT**
**(against Defendant Golden Bell)**

82.     Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "81" as though fully set forth herein.

83.     Plaintiff contests the existence of a valid agreement between the parties as the Collaboration Agreement fails to mention numerous material terms and thus, it is believed that there was never a meeting of the minds as the terms are not sufficiently definite, to create a binding agreement.

84.     However, in the event this Court finds that a valid agreement existed between the parties, Plaintiff alleges that Defendant Golden Bell has breached the Collaboration Agreement for the reasons set forth below.

85.     Plaintiff signed a Collaboration Agreement with Defendant Golden Bell on June 23, 2017. Under the Agreement, Defendant Golden Bell agreed to pay Plaintiff advances, handle all worldwide distribution, marketing and overall commercial exploitation of the Work and manage these Works in Plaintiff's best interests.

86.     Defendant Golden Bell breached the Collaboration Agreement by failing to disburse the agreed upon advances, deliver the 1,000 complementary copies of the book "Be a Turtle," handle all worldwide distribution, production, marketing, reprinting, sales, logistics, warehousing, social media, and publication of the Works, and manage the Works in Plaintiff's best interests.

87.     On or about June 2017, Plaintiff delivered to Defendants the digital files of "Be A Turtle" and that during April, May and June of 2017, Plaintiff successfully delivered "Turtles Riding Airships." Defendants accepted Plaintiff's delivery with praise and enthusiasm.

88.     Plaintiff fully complied with all of his obligations under the Collaboration Agreement while creating and delivering the Works to Defendants in good faith.

89.     Due to Defendants' willful and material breach of their contractual obligations, including, without limitation, intentional delays, Plaintiff has suffered and continues to suffer substantial economic losses and injury to his reputation in the industry.

90.     That on February 2018, Defendants agreed to print 2,000 of Plaintiff's books in exchange for $10,060.

91.      That on February 25, 2018 and July 4, 2018, Plaintiff tendered the sum of $10,060 to Defendants in exchange for the 2,000 units of the books.

92.      Defendant Goldner acknowledged Plaintiff's payment and later also admitted receiving the printed units of the books.

93.      Defendants have willfully failed to deliver the books to Plaintiff.

94.      As a result of Defendant's material and willful breach Plaintiff has been unable to commercially exploit the Works and has lost hundreds of thousands of dollars in revenue.

95.      Defendants knew the consequences of their material breach and the damages Plaintiff would suffer for Defendants' failure to fulfill the Kickstarter orders, pay Plaintiff royalties and overall misappropriate Plaintiff's potential benefits from executing the Collaboration Agreement and assigning his rights in the Works to Defendants.

96.      As a result of Defendants' material and willful breach of contract, Defendants should no longer be entitled to exploit Plaintiff's Works and Plaintiff is entitled to a reversion of his rights into the Works.

WHEREFORE, Plaintiff respectfully requests that this Court:

(i)      Grant Plaintiff monetary damages as a result of Defendants' breach in an amount to be determined at trial but not less than $200,000;

(ii)     Grant Plaintiff reasonable attorneys' fees and expenses as provided for in the Collaboration Agreement;

(iii)    Order reversion of all rights in the Works to Plaintiff; and

(iv)     Grant such other and further relief as it deems appropriate.

## AS AND FOR THE SECOND CAUSE OF ACTION FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against all Defendant Golden Bell)

97.      Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "96" as though fully set forth herein.

98.     By virtue of the Collaboration Agreement, Defendant Golden Bell owed Plaintiff a duty of good faith and fair dealing.

99.     Following Plaintiff's execution of the Collaboration Agreement, Golden Bell through its officer Marc Goldner, took advantage of the contractual relationship to coerce and harass Plaintiff in an attempt to misappropriate Plaintiff's future works.

100.    For approximately eighteen months, Golden Bell founders made baseless requests for piecemeal amendments to every single aspect of the "Be a Turtle" book including the characters, language, drawings, and page design.

101.    Plaintiff complied with Defendants' requests despite his discontent with the changes to ensure that Plaintiff's Kickstarter backers would receive their book orders.

102.    Notwithstanding Plaintiff's instructions to Defendants regarding the importance of fulfilling the Kickstarter orders on time and the parties' agreement that the book would be ready in time to send to Kickstarter backers, on November 26, 2017, Defendant Goldner informed Plaintiff that Defendants were postponing the publication date by at least six months with no concrete replacement date and requiring Plaintiff to produce his own print-run exclusively through a print facility designated by Defendants.

103.    To date, the "Be a Turtle" book remains unpublished, and Defendants have failed to commercially exploit "Turtles Riding Airships" and the "HMS Bad Idea." As a result, Plaintiff has incurred substantial losses as well as legal expenses and costs.

104.    Defendants breached the duty of good faith and fair dealing by making false promises and misrepresentations to Plaintiff knowing that Defendants did not intend to abide by the terms of any of the Agreements with Plaintiff, including the Collaboration Agreement and the Agreement to print the books for Plaintiff.

105.     Defendants further violated the covenant of good faith and fair dealing by misappropriating the $10,600 that Plaintiff tendered to Defendants in exchange for 2,000 copies of Plaintiff's books.

106.     Upon information and belief, Defendants made promises to Plaintiff in bad faith, solely for purposes of gaining leverage and securing agreements that would serve as a platform to later claim ownership of Plaintiff's future works of authorship.

107.     Upon information and belief, Defendants' business model consists of executing agreements with talented artists for a limited engagement that is often coupled with an assignment of rights in favor of Defendants followed by threats of legal action and threats to the artist's reputation.

108.     Defendants also breached the covenant of good faith and fair dealing by attempting to secure registrations of trademarks Defendants knew belonged to Plaintiff.

109.     As a result of Defendants' breach of the covenant of good faith and fair dealing, Defendants are no longer entitled to exploit Plaintiff's Works and Plaintiff is entitled to a reversion of his rights into the Works.

WHEREFORE, Plaintiff respectfully requests that this Court:

(i)      Grant Plaintiff monetary damages as a result of Defendants' breach in an amount to be determined at trial but not less than $200,000;

(ii)     Grant Plaintiff reasonable attorneys' fees and expenses as provided for in the Collaboration Agreement;

(iii)    Order reversion of all rights in Works to Plaintiff; and

(iv)     Grant such other and further relief as it deems appropriate.

## AS AND FOR THE THIRD CAUSE OF ACTION FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (against All Defendants)

110.     Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "109" as though fully set forth herein.

111.     Upon information and belief, Defendants are *alter egos* to each other and are used interchangeably in their dealings with third parties, without distinction

112.     That Defendants at all times knew of Plaintiff's business relationships with the Kickstarter backers and that the Kickstarter backers had pre-ordered copies of the Book "Be A Turtle."

113.     Defendants had actual knowledge that Plaintiff wanted to preserve his good reputation in the industry and that the relationship between Plaintiff and the Kickstarter backers was an on-going relationship which is expected to grow with every new project.

114.     Notwithstanding Defendants' knowledge, Defendants have actively interfered with Plaintiff's objective to fulfill the Kickstarter orders to ensure Plaintiff's reputation will be sufficiently tarnished so as to ensure that Plaintiff needed Defendants to commercialize future works.

115.     Defendants took all the necessary steps to clear themselves from the situation with Plaintiff's Kickstarter backers so as to prohibit Plaintiff to update the backers on a timely basis in order to protect Defendants' own reputation.  Only after Plaintiff engaged legal counsel, Defendants begrudgingly authorized Plaintiff to send a status update to the backers that did not mention Defendant Golden Bell by name.

116.     Adding insult to injury in yet another attempt to interfere with Plaintiff's prospective business relations, Defendants falsely claimed ownership of Plaintiff's mark "Rock

Paper Cynic," which Plaintiff has been using since at least October 31, 2008. Defendant applied for the "Rock, Paper Cynic" trademark knowing that the trademark belonged to Plaintiff and was specifically excluded from the Collaboration Agreement at Plaintiff's request.

117.    Defendants committed the aforementioned acts with malice and the intent to damage Plaintiff's reputation and drive him out of business.

118.    Defendants knew that Plaintiff had no other way to satisfy his obligations to the Kickstarter backers because he had waived his rights to commercialize the Works under the Collaboration Agreement. Defendants used this restriction and held the copies of Plaintiff's books hostage in an attempt to pressure Plaintiff into assigning the rights of his future works to Defendants for free.

119.    That as a result of Defendants' wrongful and malicious conduct, Plaintiff has been unable to fulfill the orders of his Kickstarter backers.

120.    Defendants' acts as described above, constitute wrongful interference with Plaintiff's business relationships which also result in substantial damages to Plaintiff's reputation.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against all Defendants jointly and severally:

(i) Awarding Plaintiff monetary damages in an amount to be determined at trial to compensate Plaintiff for his financial losses as a result of Defendants' tortious conduct;
(ii) Awarding Plaintiff punitive damages in an amount to be determined at trial;
(iii) Awarding Plaintiff reasonable attorneys' fees due to Defendants' egregious conduct, as well as the costs and disbursements of this action; and
(iv) Grant such other and further relief as it deems appropriate.

## AS AND FOR THE FOURTH CAUSE OF ACTION FOR
## BREACH OF FIDUCIARY DUTY
### (Against all Defendants)

121.    Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "120" as though fully set forth herein.

122.    Pursuant to the Collaboration Agreement, defendant Golden Bell agreed to become Plaintiff's exclusive agent "for the sale and other disposition of the Works.

123.    Defendant Golden Bell assumed the duty of handle and manage the Works in the best interest of the parties.

124.    Upon information and belief, Defendants are *alter egos* to each other, knew of the breach, and participated and added to the breach.

125.    As agents, Defendants owed Plaintiff fiduciary duties to act in accordance with Plaintiff's best interest, to protect Plaintiff's reputation, commercially exploit the Works and pay Plaintiff royalties.

126.    Defendants failure to commercially exploit the Works and refuse to deliver the copies of the books to Plaintiff so that he could fulfill the orders of his Kickstarter backers so that Defendants could use the books to gain further commercial advantages over Plaintiff were self-serving and against Plaintiff's best interests.

127.    As a result of Defendants' breach of fiduciary duty, Defendants are no longer entitled to exploit Plaintiff's Works and Plaintiff is entitled to a reversion of his rights into them.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against all Defendants jointly and severally as follows:
   (i)      Awarding Plaintiff monetary damages in an amount to be determined at trial;
   (ii)     Awarding Plaintiff reasonable attorneys' fees due to Defendants' egregious conduct;
   (iii)    Order reversion of all rights in Works to Plaintiff; and
   (iv)     Grant such other and further relief as it deems appropriate.

## AS AND FOR THE FIFTH CAUSE OF ACTION
## FOR FRAUD IN THE INDUCEMENT
### (against all Defendants)

128.     Plaintiff repeats and reiterates the allegations contained in paragraphs "1"

through "127" as though fully set forth herein.

129.     Upon information and belief Defendants are *alter egos* to each other. Defendant

Goldner controls and uses Golden Bell and Golden Bell Studios interchangeably in dealings with

third parties and have used the entities to defraud plaintiff and to unjustly benefit from plaintiff's

work.

130.     In June 2017, Defendant Goldner approached Plaintiff to publish and distribute

Plaintiff's book "Be a Turtle" and represented that he had obtained a $2.00 per unit quote to print

Plaintiff's books, including, "Be a Turtle."

131.     At the time of Defendant Goldner's approach, Plaintiff was only looking for

cost effective printing options as the prices offered by Plaintiff's current printer were not as

attractive as in prior years.

132.     Defendant Goldner knew that Plaintiff was actively seeking cost-effective

printing options to maximize his returns on sales and thus, with the intent to induce Plaintiff into

signing an agreement.

133.     Defendants' attractive offer to print copies of Plaintiff's books for $2.00 per

unit convinced Plaintiff that Defendants were in fact a great resource and alternative as

publishers due to the potential opportunity to obtain a higher financial return on Plaintiff's

Works.

134.     Defendant Goldner represented to Plaintiff that Golden Bell had a vast catalog

and multiple distribution channels as well as contacts in the printing industry.

26

135.     Plaintiff relied on Defendant Goldner's representations and reasonably believed that Defendants were in fact a successful group with multiple distribution channels and successful sales.

136.     In reliance of Defendants' false representations, Plaintiff signed a Collaboration Agreement pursuant to which Plaintiff agreed to refrain from monetizing or reproducing the Works, allowing Defendant Golden Bell to be Plaintiff's exclusive distributor.

137.     Upon information and belief, Defendants made promises to Plaintiff solely for purposes of gaining leverage and securing an agreement that would serve to pressure Plaintiff into assigning his future works to Defendants.

138.     Upon information and belief, Defendants' business model consists of executing agreements with highly talented artists for a limited engagement, that oftentimes includes an assignment of rights on a small number of the artist's works, and later Defendants use coercive tactics to secure additional rights by threatening to file legal action and destroy the artist's reputation.

139.     Defendant Goldner assured Plaintiff that Defendants would meet Plaintiff's deadlines and fulfill the orders of Plaintiff's Kickstarter backers.

140.     Defendant Goldner assured Plaintiff that by including an additional book, the "HMS Bad Idea" in the Collaboration Agreement and signing the "Peter's Turtle Addendum," the printing costs per unit would further down.

141.     Defendant Goldner knew that his representations to Plaintiff were false and Defendant Goldner had no intention to print Plaintiff's books for $2.00 per unit and timely deliver the books to Plaintiff near his August 2017 deadline.

142.     Defendant Goldner also fraudulently induced Plaintiff to enter into a sale of goods agreement whereby Plaintiff paid Defendants $10,060 in exchange for 2,000 of Plaintiff's books mainly to satisfy Plaintiff's obligation to his Kickstarter backers.

143.     Upon information and belief, Defendant Goldner had no intention to timely deliver the books to Plaintiff.

144.     Upon information and belief, Defendant Goldner knew that Plaintiff was desperate to receive the books and that he would rely on Defendant Goldner's representations and disburse the $10,060 to Defendants.

145.     Plaintiff complied with Defendants' daunting requests in a timely manner, and Defendants repeatedly confirmed receipt of the files and satisfaction with the work. Regardless of its initial and complete approval, several months later, in July 2017, Golden Bell requested further changes and provided no evidence of progress on production of the physical books.

146.     Plaintiff reasonably relied on Defendants' misrepresentations to his detriment and as a result, Plaintiff assigned the rights on his Works to Defendants and incurred significant monetary losses, including loss of business associated with the commercial exploitation of the Works, attorneys' fees as well as damage to his reputation.

147.     Because Plaintiff entered into the Collaboration Agreement relying on Defendants' misrepresentations, the assignment of rights into the Works should be declared null and void and Plaintiff is entitled to a reversion of his rights into the Works.

148.     WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants joint and severally as follows:

(i) Awarding Plaintiff monetary damages in an amount to be determined at trial but not less than $200,000;
(ii) Awarding Plaintiff punitive damages Defendants' unconscionable business practices as well as willful and wonton disregard of Plaintiff's rights;

(iii)Awarding Plaintiff reasonable attorneys' fees due to Defendants' egregious conduct, as well as the costs and disbursements of this action;

(iv)Order reversion of all rights in Works to Plaintiff; and

(v) Grant such other and further relief as it deems appropriate.

## AS AND FOR A SIXTH CAUSE OF ACTION FOR UNJUST ENRICHMENT
### (Against All Defendants)

149.    Plaintiff repeats and reiterates the allegations contained in paragraphs "1"

through "148" as though fully set forth herein.

150.    Plaintiff paid for 2,000 copies of the Book back in February 2018.

151.    Defendants received Plaintiff's funds but willfully decided to deprive Plaintiff

of the copies of the books.

152.    Defendants have benefited at Plaintiff's expense by misappropriating the copies

of the Book without providing Plaintiff with his fair and reasonable compensation.

153.    Consequently, it would be against equity and good conscience to allow

Defendant to retain what the Plaintiff seeks to recover.

Plaintiff repeats and reiterates the allegations contained in paragraphs 1 through 187 as though

fully set forth herein.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against all

Defendants joint and severally as follows:

(i)     Awarding Plaintiff monetary damages in an amount to be determined at trial;

(ii)    Awarding Plaintiff reasonable attorneys' fees due to Defendants' egregious conduct;

(iii)   Grant such other and further relief as it deems appropriate.

## AS FOR THE SEVENTH CAUSE OF ACTION
## FOR AN ACCOUNTING UNDER NEW YORK LAW
### (Against all Defendants)

29

154.     Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "153" as though fully set forth herein.

155.     Defendants took Plaintiff's money to purportedly print books on his behalf.

156.     Defendants charged Plaintiff the sum $10,600 for 2,000 units of the books but have failed to release the books to Defendants.

157.     Plaintiff is entitled to receive royalties pursuant to the Purchase Agreement and Addendum an accounting is necessary to determine the amount of royalties due to Plaintiff to date.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment as follows:

(i)     Granting Plaintiff an accounting to determine Plaintiff's damages from lost sales arising from the lack of commercial exploitation of the Works, the non-delivery of the books for the Kickstarter backers;

(ii)    Grant such other and further relief as it deems appropriate.

### AS FOR THE EIGHTH CAUSE OF ACTION FOR
### DECLARATORY JUDGMENT
### (Against All Defendants)

158.     Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "157" as though fully set forth herein.

159.     Plaintiff seeks a declaratory judgment against all Defendants, declaring that: (i) The Collaboration Agreement only involves the works, "Be a Turtle", "Turtles Riding Airships" and "The HMS Bad Idea" (ii) that Plaintiff's rights into the Works revert back to Plaintiff as a result of Defendants' breach and tortious conduct; (iii) that Plaintiff is the sole and exclusive owner to any and all of his future Works; (iv) that the trademark "Rock Paper Cynic" belongs to Plaintiff and directing Defendants to either assign the current trademark applications serial no. 88197374 and 88197358 to Plaintiff or abandon said application; (v) directing Defendants to

immediately return Plaintiff's property, including, without limitation the 2,000 copies of

Plaintiff's Book.

WHEREFORE, Plaintiff respectfully requests that this Court enter a declaratory
judgment as follows:

(1) Declaring that the Collaboration Agreement is void because it was obtained by
Defendants through false promises or is unenforceable;
(2) Declaring that Golden Bell does not have any option and/or ownership interest in
Plaintiff's past, present and future works of authorship;
(3) Declaring that the mark Rock Paper Cynic is owned by Plaintiff and Defendant's
application to the United States Patent Office is fraudulent and/or infringing on
Plaintiff's intellectual property rights;
(4) Granting such other and further relief as it deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Peter Chiykowski hereby demands a trial by jury pursuant to Rule 38 of the

Federal Rules of Civil Procedure.

Dated: New York, New York
March 13, 2019

CHINTA, PERDOMO, BERKS &
FRATANGELO, LLP

Francelina M. Perdomo (#4429)
Antoaneta Tarpanova (#2287)
Attorneys for Plaintiff
17 State Street, Suite 4000
New York, NY 10004
(212) 274-1261
fperdomo@chintaperdomo.com
atarpanova@chintaperdomo.com