# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETER CHIYKOWSKI, d/b/a ROCK, PAPER, CYNIC<br><br>Plaintiff,<br><br><br>v.<br><br><br>Marc Goldner, individually and as officer of GOLDEN BELL ENTERTAINMENT LLC and GOLDEN BELL STUDIOS, LLC and GOLDEN BELL ENTERTAINMENT, LLC and GOLDEN BELL STUDIOS, LLC<br><br>Defendants. | **No.**<br><br>**ECF Case**<br><br>**DECLARATION OF PETER CHIYKOWSKI** |

I, PETER CHIYKOWSKI, declare as follows:

1.      I am the Plaintiff in the above captioned action and as such, I am fully familiar with the facts and circumstances set forth below and submit this Declaration in support of my Complaint against Defendants.

2.      I am visual artists, comics illustrator and an author of songs, short stories, webcomics, comic books and strips.   I am the author of the books "Is it Cannon?" as well as the anthology "Be a Turtle and Other Secrets to a Happy Life by Rock, Paper, Cynic" ("Be a Turtle") and "The HMS Bad Idea."

3.      I use Kickstarter as a platform to fund and sell my work.  I have been a very successful campaign manager and have an outstanding reputation amongst clients and peers.

4.     Since late 2008, I popularize my works under the pseudonym, "Rock, Paper, Cynic" and on December 13, 2008, I acquired my website rockpapercynic.com.  In 2009, I began operating a rockpaypercynic.com online store, commercializing my works and related memorabilia such as t-shirts, mugs and cards.  **See Exhibit 1.**

5.     In April 2013, I met Jason Wiseman, who is a well-known creator of board and card games. Ever since, Jason and I have been good friends, and occasionally creative collaborators and business partners.

6.     Around 2015 Jason and I began discussing the idea of making a tabletop game. Jason would create the mechanics of the game and I would contribute the illustrations and graphic design. The game would be about turtles racing airships and as we later agreed would be entitled "Turtle Riding Airships."

7.     Throughout the month of February of 2017, Jason and I discussed the pros and cons of publishing and distributing the game ourselves on Kickstarter or using a publisher. Jason had recently been discussing game publication and distribution with Defendant Marc Goldner ("Goldner"), owner and CEO of Defendant Golden Bell Entertainment, LLC ("Golden Bell").

8.     Ultimately, Jason and I decided that Golden Bell would publish and distribute "Turtles Riding Airships" because the game would benefit from a larger distribution network as well as an adequate business infrastructure to maximize sales. Jason signed an agreement with Golden Bell on February 11, 2017 in connection to the game.

9.     In February 2017, I also launched a Kickstarter campaign to raise funds to print my books "Be a Turtle" and "Is It Canon?". As a result of the Kickstarter campaign, 334 Kickstarter backers made pledges supporting the development of the books and bring them to

print.   I successfully raised approximately $20,000.00 during the one month long Kickstarter campaign.  **See Exhibit 2, Kickstarter campaign.**

10.     In exchange for the Kickstarter backers' pledges, I promised to send rewards to each of them on or before the end of August 2017. The rewards included a printed copy of each book, a digital PDF version as well as related memorabilia, such as wooden coins.  **Id.**

11.     In March 2017, while helping Jason at PAX East (a gaming convention held in Boston March 10-12, 2017), I got to meet and socialize with Marc Goldner ("Goldner"), his girlfriend, Rachel Korsen and Robert Gross.  My understanding is that Korsen and Gross are also founders of Golden Bell along with Marc Goldner. During the convention, Goldner expressed how optimistic he was about strong game sales when "Turtles Riding Airships" was finally released to the public.

12.     During the discussions about the game on March 11, 2017, Goldner spoke extensively to me about the licensing deals he brokered for his company, and about his distribution deals pursuant to which Goldner proudly claimed he did not allow vendors to return unsold product. Goldner also told me how he had recently acquired  as many as 100 or 200 games for the Golden Bell catalogue. Based on Goldner's representations, I was under the impression that Defendants planned to sell thousands, if not tens of thousands, of copies of our game "Turtles Riding Airships."

13.     After the convention, I began to exchange texts and occasional calls with Marc Goldner, discussing his merchandizing ideas for "Turtles Riding Airships." I expressed enthusiasm, but did not feel comfortable committing to anything.

14.     I also began work on mocking up designs for a stuffed animal turtle at Goldner's request, although we had not discussed how payment, complimentary copies, rights, or attribution would work.

15.     During one of our calls, Goldner offered to help me find cheaper printing for the books I was producing through my Kickstarter and invited me to email him about it, which I did on March 24, 2017. **Exhibit 3, p. 1, Exchange March 2017.** Goldner also told me that Print Ninja used one of his factories and that he wanted to discuss "1) your books and our printer 2) Contract and 3) the Idea that is going to make Turtles the most unique board game and crazy merchandise campaign ever!" **Id.**

16.     On a subsequent call shortly thereafter, I stressed my need to receive books in time to fulfil the Kickstarter in August 2017.  Goldner said this was no problem, and explained that my existing printer, PrintNinja, marked up prices by approximately 40% and that Golden Bell could negotiate factory-direct prices with no mark-up for me that would thus be 40% less expensive. I thanked him for his help and asked him for help sourcing a quote.

17.     In an email on March 29, 2017, I reiterated Defendants that I had promised Kickstarter backers delivery of the books by end of August 2017, but that I would be comfortable being a month late if I could deliver quality at a cost-effective price point. I also provided production specifications for printing the books. **See Exhibit 3, pp. 2-3.**

18.     In a call on or about the same day , Goldner assured me my deadlines were possible.

19.     In the meantime, Jason Wiseman's work in designing the mechanics of "Turtles Riding Airships" continued and in April 2017, I began to illustrate the game board. In May 2017, I began emailing sample game cards and other assets, usually first to Jason and then with his

approval to Golden Bell. Jason and I met our delivery deadlines and Defendants expressed praise and enthusiasm with our work.

20.     On May 27, 2017 Goldner reached out to inform me that he had secured pricing for printing my books below $2 per unit**.** I was ecstatic and began reforecasting my budget based on this estimate, reserving some extra money as a buffer in case prices went up. See **Exhibit 4, Texts quote $2 per book.**

21.     I had an initial offer to publish "Be a Turtle" with my existing publisher, ChiZine Publications, but they said I was free to consider other publishers.  Around early June, ChiZine Publications began expressing a more urgent need for me to decide if I would publish with them or another publisher.

22.     June 1, 2017, I emailed the first batch of finished "Turtles Riding Airships" illustrations and design assets, which again were met with praise and enthusiasm by Defendants.

**Exhibit 5 Exchange June 11, 2017**

23.     On June 11, 2017, I emailed Golden Bell a near-final draft of "Be a Turtle" and told them I would need to decide on a publisher soon, asking them to weigh in if they wanted to publish. **Exhibit 6.**  On June 12, in the same email chain, Robert Gross, replied that the manuscript was "perfect" and in a subsequent email confirmed "I couldn't find any other mistakes and there aren't any content changes I'd make" other than one typo. I immediately corrected the typo and sent new files, which I took to mean the book was ready for print. I did not realize or expect that this was the first exchange in what would grow into 13 months of Golden Bell changing their minds and asking for new revisions on content they had already approved.

24.     On calls with Goldner in the following days, I mentioned that if we merged our print runs of the book, the printing costs would drop even further down than $2 per unit, with my print runs being in the 1500 to 3000 range and Defendants' print runs presumably being in the thousands as well. Goldner seemed enthusiastic about the idea. I also continued to remind Defendants of my August/ September 2017 deadline for fulfillment of the Kickstarter orders.

25.     On June 15, 2017, I provided the final batch of files for "Turtles Riding Airships." **Exhibit 7.**

26.     After some mid-June exchanges and calls with Marc Goldner, during which time I insisted the books would need be delivered to me by August or September 2017 at the latest, Goldner stated on the phone that Defendants would be happy to publish the book and work with me to hit my deadlines.

27.     Around that time Goldner and I verbally discussed preliminary contract terms including, advance, royalty, complimentary copies.  Thereafter, Defendants sent me a proposed Collaboration Agreement to review that also covered my work on "Turtles Riding Airships."

28.     I noticed immediate problems with the Agreement. For one thing, Defendants had included my existing book "The HMS Bad Idea" in the Agreement even though it had already been published by another publisher and we had never discussed Defendants publishing it.

29.     I followed up in an email June 23, 2017 to state that "The HMS Bad Idea" was not available and asked some clarifying questions and proposed certain changes. Most important to me was making it absolutely clear that I retained the rights to my characters from my webcomic and confirming that I was entitled to continue to freely produce work with them and that Golden Bell did not have rights on any characters that were part of my prior works not included in the agreement. **Exhibit 8 p. 1**, **Exchange re contract terms**

30.     I specifically wrote that most of the clarifications I needed had to do with "how copyright will work with characters that are in the book but existed in the webcomic before it was in book form." **Id at p.1.**

31.     For example, I further informed Defendants that I needed a provision stating " for clarity, characters that have appeared in the Artist's works that predate the WORKS will not be considered to infringe on the Company's copyright."  In addition, I clearly asked Goldner to include in paragraph 3C of the Agreement the following sentence: "for clarity the preceding sentence does not include characters that have appeared in the Artist's works that predate the WORK." **Id at p. 2.**

32.     Goldner replied that my changes were not necessary because the clause did not refer to my characters at all and only applied to "company properties." When Golden Bell called them "your characters" and created a clear delineation of *my* characters versus *their* characters, I understood that to mean that my characters would remain my own as I had intended. **Exhibit 8 at p. 2.**

33.     Golden Bell also confirmed that regarding clause 3D, my existing agreement to publish my first short story collection with ChiZine Publications would not be affected, nor would any collaborative works I produced in the future as, among others, my collaborators would not be bound by my contract.  **See Exhibit 8 p. 2**

34.     In response to my inquiry regarding clause 3D Defendant Goldner assured me "we want you to be able to grow your brand as much as humanely possible so we'd never not allow you or even think to ask you not to participate in a great opportunity."  **Id.**

35.     I felt pressured to respond and confirm the contract quickly, but I had concerns. Goldner also stressed that they wanted to sign and announce the deal that day at ALA conference, calling it "one of the new flagship properties." **Exhibit 8 p.1.**

36.     I signed the revised contract that day, June 23, 2017, at Golden Bell's urging, although Golden Bell did not sign until 7 days later. It seems the urgency was only in getting me to agree to the ambiguous terms of the contract as quickly as possible. **Exhibit 9, Agreement.**

37.     Pursuant to the terms of the Collaboration Agreement, I agreed to work with Defendants  and grant Defendant Golden Bell publishing and distribution rights on "Turtles Riding Airships" and "Be a Turtle" (the "Works") in exchange for (i) a $2,500 advance following execution of the Collaboration Agreement; (ii) another $2,500 advance upon Defendants' publication of "Be a Turtle"; (iii) an advance of $7,500 for my contributions in the "Turtles Riding Airships" collective work with Jason Wiseman (iv) a royalty of 10% of the net sales from the Works arising from different mediums including comic books, motion pictures, animation, television, gaming, radio and others in perpetuity and I also expected Defendants to (v) "handle all worldwide distribution, production, marketing, reprinting, sales, logistics, warehousing, social media and publication of the Works."   **See Exhibit 9, ¶¶ 2.B, 2.E.**

38.     On June 29, 2017, I texted Goldner to ask about the arrival of my $7,500 advance on "Turtles Riding Airships", which had not yet been paid. **Exhibit 10, Exchange re advance.**

39.     The next day Golden Bell paid me $10,000 of which $7,500 was for my share of "Turtle Riding Airships" and an additional $2,500 for the first half of my $5,000 advance on "Be a Turtle." **Exhibit 11, Advance initial payment.**

40.     Defendants failed to pay me the second half of the $5,000 advance and to this date, Defendants have failed to publish, distribute or otherwise commercialize with the Works despite their commitment to do so under the Collaboration Agreement.

41.     On June 29, 2017, I also emailed Goldner and stressed my goal of printing and shipping in the early fall and requesting the Golden Bell logo, copyright page text, ISBN #s and files, book spine width, and hardcover wrap specifications. **Exhibit 12, Exchange re timeframe.**

42.     On June 30, 2017, Goldner executed the Collaboration Agreement and a week later, on July 4, 2017, Rachel Korsen, confirmed that it will take about 2-3 weeks to get a sample started and then between 20-25 days for production, and then about 30 days to ship plus or minus a week or so for customs. Marc Goldner was also copied in the email. **Exhibit 12.**  Based on this written confirmation, I was confident that my Kickstarter backers will receive the printed version of their books by the end of September 2017 at the latest. The next day, I reiterated my request for the materials I needed to export the final print files, stating I was hoping to receive the finished books by September 20, 2017.

43.     On July 11, 2017 via WhatsApp, I requested a call to discuss print production. Goldner stated they would be available later but did not offer a time or reply to my request for one.

44.     On July 13, 2017 I again asked for a production call, stating "I'd love to get everything into print production ASAP."  **See Exhibit 13.**

45.     I also replied to the email chain on July 13, 2017 reiterating an itemized request for the copyright and printing information and files needed to finalize the print files.

46.     On July 18, 2017 we arranged a time for a call to discuss, during which time Rachel Korsen recommended that I print all copies of all of my books as hardcovers, rather than

splitting the print run between majority softcovers with a few hardcover variants as collector

items. They also recommended adding advertisements and increasing the thickness of the paper

and promised me that with their printing contacts, these changes would barely affect the printing

cost, which had most recently been quoted to me as less than $2.

47.     On July 20, 2017, I responded to the email agreeing to the hardcover change but

insisted that that we keep the book's spine thickness down to reduce shipping costs, which would

mean printing on 85lb paper. I also said that to include the ads, I would have to remove pages of

actual content to prevent the book from getting any thicker.

48.     Then, in order to convince me to get the ads in and remove some of my book's

content, Robert Gross told me that there were some pages of turtles in costumes that he was not

sure about the copyright status of, and he suggested those pages might be cut, yet made no

specific requests for me to do so.

49.     On July 23, 2017, I signed "Peter Turtles Addendum" agreeing that Golden Bell

publish The HMS Bad Idea with the understanding that the combined print runs of my copies to

fulfill the Kickstarter and Golden Bell copies for distribution would bring down both of our

costs.  **See Exhibit 14, Addendum.**

50.     On August 30, 2017 I sent an email reiterating what was missing from Defendants

to complete the books and stressed my anxiety to get the books printing, asking if there was

anything I could do to help move things along. I stated in the opening paragraph: "I've promised

backers I'd ship everything in November/December, so let me know what we need to do now to

make that happen" and Robert Gross assured me, "We'll be on it don't worry." **Exhibits 15 and**

**16.**

51.     On September 14, 2017, I emailed Golden Bell to provide updated print run numbers for the books, specifying again that my print runs for "Be a Turtle" and "The HMS Bad Idea" would be part of Golden Bell's print run, anticipating that pricing would be below the most recent quote of $2/book because of our combined print run size.  I provided my parents' home address in Canada, and asked for the books to be delivered in time for the convention "PAX Unplugged" which was scheduled to start on November 17, 2017.

52.     On September 15, 2017, Rachel Korsen replied to say she could not find certain files, such as the cover and endpapers. These files had been provided to her 2 weeks ago and had not be moved or removed from their Dropbox folder, so I sent individual links to each individual asset to make sure she couldn't miss them. I also provided a video to explain the arrangements of the endpapers in case there was any confusion, because we could not afford any further delays. I also asked about details of spot UV printing on the covers and provided a spot UV map for that additional and optional printing process. **Exhibit 17.**

53.     On September 20, 2017 Rachel Korsen asked for clarifications on how the endpapers work and requested PDF versions for the editable Photoshop Document covers that had been provided to her 20 days ago and asked for the link to The HMS Bad Idea to be sent to her. I provided clarification on all items later that day, sent her the same link to The HMS Bad Idea for the third time, and also stressed that as Golden Bell still had not provided the copyright materials and logos, the PDFs they were requesting would not be final. I again offered to add the logos and information myself if they could just provide them. **Id.**

54.     On September 25, with growing anxiety, I again reiterated my statement reminding Defendants I would be leaving for a month-long wedding and honeymoon trip. I also inquired about an arrival date on the books so I could update backers.

55.     On September 26, Rachel Korsen finally replied asking for PDFs again and not addressing the points raised in my other emails. After discussing editable and non-editable PDFs further, Rachel realized she could use the editable Photoshop files I provided back in August 2017 to export her own PDFs. **Id.**

56.     Korsen then asked me how the endpapers of one of the books should be ordered, and I again provided the same clarification I had initially provided in August with questions related to weight of paper, paper finish , book dimensions and other details we had discussed approximately 6 months earlier and that were in fact readily visible in every design file I had previously sent to Defendants. I was stunned that my publisher and print manager did not know how to find out this basic information, but rather than raising concerns I focused on getting the information they needed so we could finally print my books**. Id.**

57.     Finally, on September 27, 2017, Defendants confirmed that the printer had the files and were checking them. Id.

58.     I had not been told of any changes to the new deadline, which was now November 17, 2017 as an ideal delivery date or December 1, 2017 as a back-up.   At this time, I assumed that we were still on track with the $2.00 per unit previously quoted price.

59.     Only on October 3, 2017, just four days before my wedding, I requested Defendants to confirm that I could promise my Kickstarter backers delivery in December before going on my honeymoon. **Exhibit 18.**

60.     At this time Goldner admitted how far off-track production had gotten, saying there was no chance the books would arrive before 2018.

61.     I was so upset. I had sending so many emails trying ensure that Defendants provide their side of the needed materials to print and trusting that they were keeping an eye on

their deadlines. I couldn't believe they had thought so little about checking in with me about timelines and communicated the delays so poorly. I also couldn't believe they were only coming clean now.

62.     I expressed my concerns directly and acknowledged that I was speaking out of frustration. Golden Bell responded providing some pictures of production samples to reassure me and a new deadline – this time for about mid-January 2018.

63.     It was not much, but it was progress, and so I thanked them for responding so quickly.

64.     In October 2017, Goldner emailed me while I was away on honeymoon, with an idea that would require me to redraw the entire cover of "Turtles Riding Airships.". I had assumed the game was already in production given that Golden Bell had stated it would have a 2017 release date. Since I was on my honeymoon, I did not answer the email.

65.     On October 28, 2017, I received dozens of WhatsApp messages from Marc Goldner outlining more than 30 changes to "The HMS Bad Idea." I was extremely confused and had been under the impression that book was already in production.

66.     I expressed a willingness to work with Goldner on changes but expressed that I thought we should have handled edits such as this one at least 3 or 4 months earlier. Goldner briefly apologized for having been backlogged, clearly acknowledging that the delays were his fault.

67.     Privately, I was concerned that during the entire month I was on honeymoon, Golden Bell had done absolutely nothing to further production of the books. Edits of this scope would also mean restarting the print production process from square one with new files, setting us back where we were in August. I began to harbor serious doubts about the legitimacy of

Defendants' professionalism, competency, understanding of basic print production principles and overall legitimacy as a business. I feared that Defendants did not have my best interest in mind and instead were pursuing their own hidden agenda to use my Works for their sole and exclusive interest and benefit.

68.     Later that day, Goldner sent another 24 requested changes by WhatsApp for "Be a Turtle" a manuscript that Golden Bell had said required no changes four months earlier and which was already supposed to have been printed and delivered by the original timeline discussed.

69.     I was beyond frustrated but maintained positivity and professionalism to ensure that Defendants did not find an unreasonable excuse to blame their conduct on me.

70.     Over the next few days I arranged calls with Goldner to discuss his changes and strike unnecessary edits. Goldner had created a massive Google document with phone-camera photo images of printed book pages with his changes. I wrote short notes on the edits we agreed on and used color-coded Google highlights to note which changes we had agreed were necessary, discretionary or unnecessary.

71.     On November 2, 2017, I sent an email and a WhatsApp reiterating my request for an outstanding logo and the copyright page and reiterated it again on November 3, 2017.

72.     With no files provided, I decided to hand in another set of the editable files in which I had turned around all requested changes and provided Golden Bell with a new set of links and files. I again reiterated my request for basic copyright information and logos to complete the files. I also provided updated print numbers for the books, realizing that the many delays in getting the books out was hurting my sales and cash flow. It seemed necessary to scale back on printing expenses.

73.     It was around this time, mid November 2017, that Defendants again introduced a massive delay that they could have told me about or forecasted timeline changes for months ago. They told me I would need to collect guest artist contracts for all 40 contributors to "The HMS Bad Idea."

74.     It boggled my mind that they were only telling me this now. Particularly because, as a previously published work, the contributors had already granted their permission for me to use their art within the scope of the book so no additional clearances could have been necessary.

75.     I had given Defendants a copy of the already published book in March in Boston, so Defendants had 8 months to assess the content.  If Defendants needed additional clearances from the guest artists, they should have informed me before I signed the Collaboration Agreement and before promising me the books could be produced in the summer/fall of 2017.

76.     Concerned regarding the delays on both "Be a Turtle" and "Turtles Riding Airships", I tried to search online to find any reference to a listed publication date for either and found that Defendants had done little to no promotion for either of these so-called "flagship properties" and not announced any information about their release.

77.     The only reference I could find to the publication of "Turtles Riding Airships" was a trademark application that Golden Bell had submitted for "Turtles Riding Airships."

78.     I also noticed a trademark application for "Unipegasaurus" which, as far as I was concerned was the intellectual property of Megan McKay, one of creators who reached out to me to ask about Golden Bell's reputation when she had been thinking about signing with them. Strangely, however, the trademark application had been filed before Megan spoke to me about the possibility of signing with Golden Bell, which meant that Golden Bell had applied for her trademark before she would even have had a chance to sign a contract with them.

79.     At this time, on or about November 2017, I began to do some more research on Golden Bell and the concerns that had been raised about Golden Bell's reputation. I very quickly found a reddit thread citing Golden Bell's "predatory contracts" and claiming "Golden bell is a scam."

80.     I soon found more and more online discussions with warnings like: "If you ever are contacted by them, run the other way." The Defendants were mentioned in several places as scammers.  https://www.bgdf.com/forum/bgdf-esp/discusión-general/kickstarter-help; see also https://www.reddit.com/r/tabletopgamedesign/comments/66hz4m/game_publishers_going_big_vs_keeping_it_indie/

81.     Another comment stated that Golden Bell targeted Kickstarters and "mostly signs first-time creators, especially those who are a year+ late in delivering (those who are more desperate)."   At this time, I realized that Golden Bell had established a trend of establishing relationships with naïve creators like myself who had Kickstarter timelines to meet, which would allow Defendants to have all the leverage in negotiations. https://www.reddit.com/r/tabletopgamedesign/comments/64s8ug/psa_game_designers_be_wary_of_malicious_publisher/?st=j1qi697r&sh=4cc2b6c7

82.     With Golden Bell joining me for larger print runs and the execution of the Addendum granting publishing and distribution rights to Golden Bell over "the HMS Bad Idea" I relied on Plaintiff promises regarding the $2.00 price and expected even lower prices due to our combined print runs.  I was shocked when Defendants told me on November 26, 2017 they were pulling out of the print run and that I couldn't count on them to provide my 1,000 complimentary copies of "Be a Turtle" for at least 6 months since that's how long their size of print run would

take to produce and that my books would now cost $4.20 to $4.52 each <u>before</u> shipping, which would add at least $2,200. **Exhibit 19, Exchange about price increase.**

83. I was stunned. I had been budgeting assuming I would receive the 1,000 complimentary copies promised in my contract, and that I would be purchasing additional books at the prices we initially discussed.

84. My budget of $4,000 for book production would now cost at least $11,240, almost 3 times what I had expected based on the promises that had induced me to sign with Golden Bell. Also, these books wouldn't arrive until February 2018.

85. Just back from honeymoon (and by far the biggest financial commitment of my life paying for the wedding), and with my wife just having quit her job, I was stunned that my publisher was tripling the price on me. I was stunned that the books would now be 6 months later compared to the original goal when we began discussing production in the spring.

86. I was now certain that Defendants were intentionally taking advantage of me particularly because I was dependent on them for production.

87. On November 29, 2017, I received a threatening-sounding WhatsApp message from Marc Goldner "Peter, we need to know if it was your or Apur told Megan about Unipegasuaurs. We have signed agreements with her and now they're being interfered with. Please let us know right away as this is a very serious violation. Thanks." I had a near-instant panic attack. I knew I hadn't done anything wrong because trademark applications are public records, but everything I had recently learned about Defendants suggested they were extremely litigious.

88. I knew that "Unipegasaurus" was only a character in Jason Wiseman's "Pretending to Grownup" game and I also knew that Megan McKay created that character so I

was taken aback by Defendants trademark filing and discussed it with my collaborator and friend Jason Wiseman.  After I received the message from Goldner, I was convinced that Defendants had filed for the trademarks in an effort to misappropriate the character.

89.     I responded carefully, explaining that I had seen the trademark applications and reached out to the creators with basic inquiries.  Over the next few hours Goldner messaged me numerous times. He said he was now going to have to pursue legal action against Megan McKay, and then 9 minutes later claimed that the situation had already cost him thousands in legal fees that Megan would have to pay. He claimed that Megan had signed a deal with Golden Bell and then immediately cut off all contact. He said that if I was her friend, I would convince her to drop her claim in connection to the "Unipegasaurus" character.

90.     In the same set of messages, Goldner strongly implied his conflict with Megan was my fault and that I would have to convince Megan to back down. I made it clear that I was not comfortable getting involved, and that I had company over at the moment and I would respond to Golden Bell tomorrow. Golden Bell was threatening legal action and I wanted time to carefully consider my response.

91.     Goldner said that was fine, but then seemingly changed his mind, messaging 1h25m later: "Hey peter if there's anything u wanna tell me nows the time Bc we're filing suit tomorrow."  Realizing they were likely using time pressure to get me to make a rash decision, I took a couple days to plan my response, sending a lengthy email explaining why I ended up looking at the trademark applications.  Convinced that Goldner had unlimited legal resources and a vengeful streak toward collaborators he saw as ungrateful or disloyal, I was careful to maintain positivity and expressed my gratitude for his partnership even as I also shared my frustration with the numerous delays and price changes.

92.    On November 30, 2017, Goldner took responsibility for the delays in printing the book and stated "this I take 100% of the blame for" and claimed that he did not know that fulfilling timely the Kickstarter orders was that important to me.   See **Exhibit 20.**

93.    Goldner informed how much legal power he had over both Megan and myself in the matter of the trademark dispute, stating his attorney was going "destroy this girls life" and that he didn't feel bad about it all. He also said that Megan's guest art would have to be removed from my book, along with the guest art and foreword by Nick Seluk, a New York Times-bestselling cartoonist whose contributions to the book were a major part of the promise I made to Kickstarter backers.  **Exhibit 21, Exchange re Megan.**

94.    On or about December 19, 2017 Goldner wrote that his attorney said it was my fault that this was happening, and that I had breached the Collaboration Agreement and committed tortious interference. **See Exhibit 22, Exchange with Goldner re tortious interference.**

95.    I was scared that I had signed with an extremely predatory company that did not have my best interests at heart, and that I had little recourse to escape. I decided to set my course on getting the books printed expediently to minimize Defendants' leverage.

96.    On the same exchange in December 2017, I requested Goldner to allow me to take back my rights to the books so I could publish the books with original guest contributions. Golden Bell at first refused to let me do so, and then offered deals whereby I returned my advance, indemnified them, and they would still hold the rights to the books, but even then they would still retain editorial control.  This was obviously absurd.  See **Exhibit 22, p. 3.**

97.     Goldner also refused to take responsibility for the damage being done to my reputation by the delays and the removal of a prominently advertised New York Times-bestselling contributor.

98.     In on about mid- December I told Golden Bell I would be printing the book "Is It Canon?" with another printer to save money. Because it was a book they did not have a publishing deal with me for, and they were merely helping me source a printer for, they did not object.

99.     On January 9, 2018, I asked Defendants to please provide some kind of statement of explanation about the delay and changes to share with my Kickstarter backers. Defendants did not respond. I asked again on January 23, 2018 and a week later Goldner finally responded denying my request. I felt like I was being stonewalled and forced to damage my own credibility. I felt like Golden Bell had no concern whatsoever for how it was affecting me.

100.    In February 2018, Golden Bell and I began to discuss the finalized costs of printing. Golden Bell continued to offer pricing that was upwards of triple what I had budgeted for based on their previous quotes. Suspecting they could be artificially inflating the prices, I asked if I could source alternate quotes, and Golden Bell agreed, but Marc was pessimistic about the possibilities of me finding a better deal. **Exhibit 23, Exchange re alternative printer.**

101.    When I managed to find a quote from Webcom, a reputable Canadian printer with one of the largest and best print facilities in Canada, Goldner replied that "the price is even more AND the quality is actual garbage" and that he did not recommend as  it was impossible that domestic is cheaper. I found Marc's response suspicious for 3 reasons: first, Goldner  sent it within 3 minutes of the quote being emailed to us, meaning he had taken no time to assess it fully; second, as far as I know, Goldner had never seen a print sample from this highly reputable

company, and therefore had no basis on which to call the quality "actual garbage"; and finally, the quote was actually LESS expensive than Marc's overseas facility after the Canadian-US dollar conversion. **Id.**

102.     It should be noted that recently Defendants have posted on their website a link to pre-order copies of the book "Be a Turtle" with an expected delivery date for May 2019, and that they have published pages of their product catalogue listing "Be a Turtle" for publication in Q4 2018. If Defendants' claim that their print runs take six months is to be believed, then they must have started producing the books no later than November. Given that my books were not produced until fall 2018, I believe Defendants were secretly buying into my print run to produce their own copies, but having me overpay for my portion of the print run to fund their own copies.

103.     On February 13, 2018 Golden Bell came back with a slightly more competitive quote of $10,600 for the books, which was still 2.5 times more expensive than their original quote they gave me before they had convinced me to sign the contract. **Exhibit 24.**  However, I didn't think I would get a better deal. Goldner also began to pressure me to pay as soon as possible to secure the quote before the offer went away, using time pressure to rush a decision.

104.     I asked if I could apply the remaining $2,500 of my advance to reduce the cost of the print run, and Golden Bell denied the request. They did offer to let me pay $7,000 up front, but insisted that I would have to pay the remaining $3,600 within six months.

105.     On February 25, 2018, Goldner insisted "the factory is ready to roll let me know if you can pay soon." I sent Golden Bell the initial $7,000, believing they would invent a reason to deny any printing alternatives I presented them with. I was also frustrated that they had already wasted a month of production time denying my reasonable printing requests. Later I paid the balance of $3,060. **Exhibit 25, Payment confirmations.**

106.    In March 2018, I secured a new foreword for "Be a Turtle "and found ways to remove the content originally provided by Megan McKay and Nick Seluk because I did not feel I had any other options.  I also began to stress about money. Normally I would have a launched a new Kickstarter project at this time to raise funds for a new project and another year of producing webcomics, but I did not want to insult my backers by running a project with "Be a Turtle" so badly delayed. I was also concerned that Golden Bell would try to claim they owned any future projects and I would lose all the fundraising money to a legal battle I had no interest in.

107.    I began to experience a persistent state of hopelessness and depression, spending entire days unable to produce creative work. I also felt paralyzed and isolated by my inability to discuss the true cause of the delays with backers, or anyone else, because of the threat of a legal action from Defendants. The depression persisted on and off through most of 2018. As someone who earns his entire livelihood through creative work, I couldn't see any path back to financial stability with Defendants' chokehold on my work and my Kickstarter fulfilment plans.

108.    Around this time, I began to research other Kickstarter campaigns signed or run by Defendants. I found evidence of multiple creators or backers in dispute with Golden Bell over delayed delivery of projects. The creators' reputations seemed to be suffering because of the delays. These projects included (i) Originz; (ii) Rank; (iii) Out Last Westbrooke and (iv) Pretending to Grownup.

109.    On April 2, 2018, I provided Defendants with a new complete copy of "Be a Turtle", again reminding them that they still had not provided logos. The copyright pages had still not been sent to me. The first requests for these basic assets had been sent more than six months ago.

110.    On May 3, 2018, I followed up with Defendants to specify that I desperately needed to have the copies of "Be a Turtle" on hand for Gen Con at the very beginning of August 2018. On May 6, 2018, I followed up again to reiterate my request for Defendants to provide assets, including an image of the stuffed animal turtle for which Golden Bell had insisted they wanted an advertisement. The files I sent them in April had now been untouched for a month despite my calls for urgency.  Goldner responded via WhatsApp to say he hoped we could finish this week.

111.    On May 29, 2018, I started a new email chain asking for a timeline for delivery stressing that Defendants had basically been delaying the books an extra 2 months for an accessory piece in one advertisement, and if the factory wasn't hitting deadlines it didn't seem worth it to make the backers wait while they figured it out. I wanted Defendants to commit to a drop-dead date.   Two days later Goldner responded "I think we can get to printer by Sunday night their Monday morning."  See **Exhibit 26, Exchange regarding delivery dates.**

112.    I was ecstatic. I finally had confirmation that the book would actually be going to the printer within a matter of days with little room for error.

113.    The next day on May 31, 2018 Goldner provided low-quality images for the advertisement. I did not think they were worth the two-month wait, but I decided it would be better to just finish the book with the materials we had rather than raising concerns. At this point we were risking being over a year late. Shortly thereafter, I emailed Golden Bell the revised final print files, again asking for an updated timeline. There was still no copyright page, but I assumed that Golden Bell had plans to add it to the editable files as they had ignored my numerous requests to provide one over the past 11 months.

114.    On June 7, 2018, I sent a follow up message asking for any status update on the printing. Goldner's response indicated that the factory had purchased the wrong paper. Seeing as the paper type hadn't changed since July 2017, I insisted that the factory fix their error at no cost.

115.    Realizing that Defendants were making no visible effort to adhere to a timeline, I gave up on receiving my books in time for Gen Con in August 2018 and instead reminded Defendants  that I would be moving to the UK in the fall of 2018 and would absolutely need the books before then, but that I would still like them for Gen Con or Fan Expo in August of 2018. Goldner indicated that having books for the conventions was possible.

116.    On June 15, 2018, I noticed that Defendants still had not added the copyright pages to the editable files. I checked in with Defendants from June 15, 2018 to June 23, 2018. Finally, on June 26, 2018, Goldner approved the copyright page stating that this was the last change.

117.    I was relieved that he was promising that no further changes would be needed. It seemed frankly impossible that they could delay the books any further.

118.    The same day I added the copyright page to the book and sent new files.

119.    On June 26, 2018 Goldner then replied with an additional 21 lines of editorial notes. I couldn't believe Defendants were still making editorial changes on a book I had sent them over a year ago and which they had called "perfect" and indicated as ready to print with no editorial changes. It was unbelievable behavior for a professional publisher.

120.    On June 27, 2018, Robert Gross sent three more change requests, and identified that the logos Defendants had previously provided were wrong. I was provided with a new set and I again exported the files and sent them to Defendants.

121.     At this point I had lost track of the number of times had emailed Defendants "final" print files. I had also made over 30 separate requests for Golden Bell to send me their most basic assets that they required in the book, like logos, copyright info, and advertisement images.

122.     In email dated June 27, 2018 Goldner indicated that the factory would print books in 20 days and shipping would then take 20-30 days. On July 18, 2018 via WhatsApp, I told Defendants how close I was to my breaking point with stress, hoping that they would either release my intellectual property, deliver the books or both.  Goldner commiserated and offered encouragement.

123.     I also told them that the short story collection I had a previous agreement for with my old publisher was about to launch on Kickstarter. They did not show any interest.

124.     On July 27, 2018, I again followed up for a printing update. On July 28, 2018, Goldner mentioned that the end sheets were not printing properly. These same files had originally been exported in July 2017, meaning Golden Bell failed to identify this error for over 12 months. I provided new files. The only change required was to specify the file extension in the filename.

125.     Throughout all of Defendants unjustified delays, the Kickstarter backers continued to push me for updates on the printing and arrival of the books, which was a year late. I felt powerless to communicate with the backers about the situation with Defendants. Also, with all the broken promises from Defendants on timelines, I wasn't sure what information I could share with backers that would turn out to be true. On September 16, 2018, a week after my drop-dead date for receiving the books, Goldner sent me a picture of printed book interiors loose in a

bag, presumably still at the printing facility in China. He said they still needed to bind the books and make cartons to put them in.

126.    On September 19, 2018, Goldner followed up with pictures of the bound books, claiming the factory needed more time to make boxes for the books.  **See Exhibit 27, Photo of printed books.   I was later informed that Defendants had been in possession of the 2,000 copies of the book since early September 2018.**

127.    On September 29, 2018, Goldner indicated that he wanted to discuss future projects and the options clause of the Collaboration Agreement. I suspected that before Goldner allowed the books to be shipped to me, he would try to force me to agree an unfavorable interpretation of the options clause in the Agreement.   **See Exhibit 28, Discussion regarding potential future collaborations.**

128.    In response, I informed Goldner that with our first project together being 14 months late, I wanted to see how the book turned out before talking about the next project. I also asked for another update on the books, stressing that I risked losing my immigration visa if I could not fly out to the UK before my entry vignette expired. Goldner replied that he would "check in with the box factory."

129.    It seemed patently ridiculous and an obvious stalling tactic that 2,000 books were completely finished printing and being delayed by "the box factory." No factory would need 2 weeks to find boxes to put books in, and it is to the detriment of the print facility to have a palette of loose books take up space on their production floor for no discernible reason.

130.    Goldner then asked me to promote his current Lunarbaboon Kickstarter to my Kickstarter backers, who still had not received their books or any revised timeline for their

books. I told him how uncomfortable it made me to promote another project to backers who had

had to wait so long without their books or information on their books.

131.    On October 1, 2018, Goldner was still claiming that the boxes needed to be

manufactured.  On this same day, Goldner also emailed me claiming that the work I had

completed on Turtles Riding Airships 14 months ago was incomplete and that I should never

have been paid for it. To me, this was a shocking and untrue claim. More than a year had elapsed

since the files were handed in and reviewed by Golden Bell, and Golden Bell had been extremely

enthusiastic about expressing satisfaction about the high quality of work I had produced.

132.    At this point, I was convinced I was being squeezed for free work and that my

books were being withheld on purpose to give Golden Bell leverage for contract negotiations.

133.    Also, the short story collection with my old publisher had recently raised more

than $50,000 on Kickstarter, and I assumed that even though Goldner had agreed to and been

informed of its publication multiple times since June 2017, he was now interested in how much

money it had earned.

134.    On October 4, 2018, Marc Goldner sent me a WhatsApp message stating that he

was having a dispute with Jason Wiseman. **Exhibit 29**.

135.    On October 14, 2018, Marc Goldner sent me a WhatsApp message calling Jason

Wiseman and his collaborator Alex Cohen "assholes" and claiming he was suing them. He

claimed, "Jason 100% scammed us and owes us 80 grand." **Id**.

136.    Seeing that Marc was stating intent to sue multiple parties and was repeatedly

putting pressure on me to commit to a conversation about my contract, I decided it was time to

turn the conversation over to an attorney and contacted Isaac Fine of the firm KPPB, LLP

("KPPB") to assist me with my issues with Defendants and decided to retain his firm on or about October 16, 2018..

137.    On October 17, 2018, I emailed Golden Bell, and copied KPPB. I reiterated the issues with the books and asked Golden Bell to contact my attorneys for conversations about the Collaboration Agreement.  Goldner tried to contact me on WhatsApp, and I again stated that he should contact my attorney. Goldner replied that "only thing to understand that you can convey to your attorney is that we have an Option, which means we have a right to all your future works that you're publishing."  **See Exhibit 30, Exchange with Goldner**.

138.    Goldner implied that he would work on the delivery of the books while I work on delivering art to Defendants regarding Lunarbaboon. **Id.**

139.    This was obviously a gross misstatement about the nature of the Agreement and the options clause.

140.    On October 26, 2018, I emailed Defendants, again copying  KPPB in the message. I submitted a Kickstarter update I planned to post regarding the book delays. The text did not name Golden Bell, but explained that the books had not arrived and that I had been provided with an explanation for the delays nor when the books would arrive, and highlighted my frustration with the situation.

141.    I wanted to tell backers about how Golden Bell had lied numerous times about timelines and pricing, and how not having the books for 14 months had cost me hundreds of thousands of dollars in lost sales opportunities and legal fees. Instead, I focused on the ongoing settlement negotiations hoping that Defendants would finally release the copies of the books that I had paid for back in February 2018.

142.     I thought my relatively tame update would be fine, given how much of the truth I had held back and how I kept Defendants' name out of it. Instead Goldner replied with 2,800-word email during which he (i) denied permission for me to reach out to my Kickstarter backers; (ii) falsely accused me of "pulling garbage"; (iii)  falsely claimed that "Turtles Riding Airships" was not complete; (iv) falsely claimed that Defendants owned an option on the short stories I had disclosed to them numerous times without any interest on their part; (v) falsely accused me of illegally printing copies of "The HMS Bad Idea"; (vi) falsely accused me of attempting to formally disparage them in a Facebook group, which they claimed to have access by private means; (vii) wrongly referred to our collaboration agreement as a "purchase agreement"; (viii) wrongly claimed that "Rock Paper Cynic" was included in the Collaboration Agreement; (ix) attempted to discredit my then attorney.  **See Exhibit 31.**

143.     In addition, Goldner said that if I posted the Kickstarter update I should "prepare for a battle you will lose," and suggested that if I abandoned my legal representation, he would not sue me and we could "continue working together, making comics, publishing your works, getting you free complimentary copies to sell at conventions to live off of, receive royalty checks, continue working on new games, new comics, and forget all of this ever happened." **See Id.**

144.     I was shocked by the email. It seemed highly inappropriate that Defendants threatened to sue me while also pressuring me to give up my right to legal representation.

145.     Also, Defendants had grossly misconstrued the exploitative and one-sided relationship they wished to "continue working together" as Defendants had not yet published a single book or game of mine, provided a single complimentary copy, or sent a single royalty check, nor had I had produced any new titles with them since signing with them. Recently I

noticed that Defendants are purportedly selling preorders of the book "Be a Turtle" on their website for $25.00 per unit. **Exhibit 32.**

146.    Defendant also made claims that "we've been promoting Rock, Paper, Cynic everywhere we go" and "we've been promoting the works at over a dozen trade shows, we've printed advertisements teasing Turtles Riding Airships in all our Webcomic World games."  See Id.

147.    I have yet to see any evidence of them promoting my webcomic anywhere, and at the time, the only Webcomic World game Golden Bell had produced was "Pretending to Grown Up" for which I had designed an advertisement for the rulebook prior to them signing the game, and so this reflects no effort whatsoever from Golden Bell.

148.    Utterly baffled, KPPB attempted to contact Robert Garson, the in-house legal counsel listed on Golden Bell's website. Robert Garson revealed to us that he was not Golden Bell's in-house counsel, and that he was unaware they had been claiming him as such but confirmed that his firm represents Golden Bell. Golden Bell later amended their website to no longer make this false claim about Mr. Garson.

149.    Despite my multiple requests for Goldner to channel all communication through my then lawyer Isaac Fine, Goldner continued to pressure me privately on WhatsApp, claiming that he would refuse to communicate with my lawyers and that he was taking my books as a lien against the "Turtles Riding Airships" advance. In one message he stated that there would be lawyers and "either we can talk and resolve this or you can sue us."  See **Exhibit 29.**

150.    Given Goldner's unwillingness to discuss any kind of negotiation, we reached out to his legal team multiple times to negotiate permission to post my Kickstarter update as worded.

On November 16, 2018 this permission was given through Defendants' attorney and I was able to make the post. **Exhibit 33**.

151.    I considered this a step in the right direction toward open negotiations. KPPB attempted to negotiate the release of enough books to fulfil the Kickstarter as a token of good faith.   However, negotiations continued to falter with Goldner's unwillingness to pay for the excess shipping costs introduced by his insistence on shipping only some of the books to me while baselessly withholding the rest.

152.    As negotiations floundered, I conducted a trademark search and discovered that on November 16, 2018, the same night that Goldner gave permission to make the Kickstarter post, he also fraudulently applied for the trademark to Rock Paper Cynic using screenshots of my website taken with a computer. **Exhibits 34 and 35.**

153.    At this time, I realized that during what I thought were good faith negotiations Goldner without my authorization and consent,  for my trademark "Rock, Paper, Cynic" and that further negotiations would only afford Defendants more time and thus, opportunities to damage my business and misappropriate my intellectual property. I decided that litigation was necessary and retained the firm Chinta Perdomo Berks & Fratangelo LLP in New York.

154.    I have incurred substantial monetary damages as a result of Defendants' actions.

155.    The books "Be A Turtle" and "HMS Bad Idea" can retail for at least $25.00 per book.  Based on my Kickstarter campaign and the success I had with my backers prior to my dealings with Defendants, and will the right publisher, marketing and distribution streams, I could have sold anywhere between 3,600 to 5,000 books per year.  I have lost 2 years of profitable book sales and praise from my followers and Kickstarter backers due to Defendants' breach and egregious conduct.

156.    For "Turtles Riding Airships" I would have expected to receive at least $21,000 per print run.  Based on my prior collaborations with Jason Wiseman, he can have a minimum of 2 print runs per year on the games he creates depending on the game's demand and overall success and popularity.

157.    I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.


Dated: March 12, 2019
        London, United Kingdom


_____
PETER CHIYKOWSKI